1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

MICHAEL C. LEE,

Plaintiff,

v.

CITY OF SAN DIEGO, et al.,

Defendants.

Case No.:  18-cv-0159 W(BLM)

**ORDER: (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' SUMMARY-JUDGMENT MOTION [DOC. 42] AND (2) GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DOC. 43]**

Pending before the Court are the parties' cross-motions for summary judgment and partial summary judgment.  The Court decides the matter on the papers submitted and without oral argument.  See Civ. L.R. 7.1(d.1).  For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' summary-judgment motion [Doc. 42] and **GRANTS** Plaintiff's motion for partial summary judgment [Doc. 43].

//

//

1

1    I.    **INTRODUCTION**

2          This lawsuit arises from the arrest of Plaintiff Michael Lee.  Defendants are the

3    City of San Diego, and San Diego Police Officers Robert Lawyer, Peter Larson, Steven

4    Choy and Darrell Cox, who were each involved in varying degrees in the arrest.

5          Defendants' motion seeks summary adjudication of all of Lee's causes of action.

6    Because disputed issues of fact pervade the circumstances surrounding Lee's arrest, the

7    Court finds under Lee's version of events, a reasonable jury could conclude the officers

8    used excessive force.  This finding is required under <u>Blankenhorn v. City of Orange</u>, 485

9    F.3d 463 (9th Cir. 2007), which is sufficiently analogous to notify the officers that the

10   force used was not objectively reasonable under the circumstances.  Accordingly, the

11   officers are not entitled to qualified immunity for Lee's Fourth Amendment excessive

12   force claim.  Additionally, because a reasonable jury could find the officers used

13   excessive force, Defendants' motion is also denied as to Lee's state-law causes of action

14   for negligence and battery, and his request for punitive damages.  Disputed issues of fact

15   also preclude summary adjudication of Lee's false arrest cause of action.  However,

16   because the record is devoid of evidence supporting an inference that the officers

17   specifically intended to violate Lee's Fourth Amendment rights, summary adjudication of

18   the Bane Act cause of action is warranted.

19         Lee's motion seeks a determination that San Diego Municipal Code ("SDMC") §

20   82.0203, which led to Officer Lawyer's decision to detain Lee, is unconstitutionally

21   vague.  The City asserts the ordinance prohibits obstruction of the sidewalks.  However,

22   as worded, the ordinance does not require an obstruction and makes it a crime for a

23   pedestrian to stop in the middle of an uncrowded sidewalk to answer a cell phone or ask

24   for directions.  Because the ordinance fails to provide notice to the public and provides no

25   guidance to officers, the Court finds SDMC § 82.0203 is unconstitutionally vague.

26   //

27   //

28   //

2

## II.   FACTUAL BACKGROUND[1]

The following factual background primarily relates to the excessive-force claim. Thus, where the facts are in dispute, the Court must accept Lee's version of events to the extent it is supported by evidence.  Scott v. Harris, 550 U.S. 372, 378 (2007).

On the evening of Saturday, May 28, 2017, Plaintiff Michael C. Lee was with several friends at Parq, a club in downtown San Diego's Gaslamp Quarter.  (*Lee Decl.* [Doc. 44-1] ¶ 3.[2])  Lee had driven to the club with several friends, including Randall Evans, the designated driver.  (*Id.* ¶ 4.)

As the club was about to close at approximately 1:45 a.m., Lee had become separated from his friends and began walking alone back to the car.  (*Lee Decl.* [Doc. 44-1] ¶ 3.)  While walking, Lee was talking on his cell phone with Evans, who had already reached the car and was driving to pick up Lee.  (*Id.* ¶ 4.)  Lee was trying to explain where he was located and eventually sent Evans a text pinpointing his location.  (*Id.*)  Evans told Lee to stay put so he could pick him up.  (*Id.*)

At the time, Lee was about 1½ blocks from Parq, stopped on the sidewalk along Fifth Avenue between two restaurant/bars called Sadaf and Casablanca.  (*Lee Decl.* [Doc. 44-1] ¶ 3.)  The area was crowded with people, some of whom were standing around talking.  (*See id.* ¶ 5; *Lawyer BC Video* 0:00:00–0:00:50; *Larson BC Video* 0:01:05.[3])  This busy time of night is generally referred to as "bar break" because bars and restaurants stop serving alcohol as they kick people out.  (*Larson Depo.* [Doc. 42-6]

---

[1] Exhibits filed in support of Defendants' motion ("Defs' Exhibit") are attached to Seetal Tejura's declaration ("Tejura Decl.").  (*See Tejura Decl.* [Doc. 42-2] ¶ 3.)  Exhibits filed in opposition to the motion ("Pl's Opp'n Exhibit") are attached to Michael R. Marrinan's declaration ("Marrinan Opp'n Decl.").  (*See Marrinan Decl.* [Ex. 44-12] ¶ 2.)

[2] Michael Lee's declaration ("Lee Decl.") is Pl's Opp'n Exhibit 1 [Doc. 44-1].

[3] Officer Lawyer's body camera video ("Lawyer BC Video") is Defs' Exhibit 9 [Doc. 42-5] and Pl's Opp'n Exhibit 11 [44-11].  Officer Larson's body camera video ("Larson BC Video") is Defs' Exhibit 11 [Doc. 42-5] and Pl's Opp'n Exhibit 12 [44-11].  (*Id.*)

030:2–23.[4])  Although cars usually are allowed to park along Fifth Avenue, on Friday and Saturday nights street signs prohibit parking and instead designate the area as a 3-minute passenger loading zone.  (*Larson Depo.* [Doc. 44-5] 34:13–35:16.)

While Lee was standing talking on his cell phone to Evans, he noticed a "commotion or argument" involving two African-American men in front of Sadaf, which ended quickly.  (*Lee Decl.* [Doc. 44-1] ¶ 5.)  Lee was not involved in the commotion.  (*Id.* ¶¶ 5, 6.)  However, "[s]hortly after seeing the commotion . . ., a large African American man wearing a backward baseball cap appeared near [Lee]."  (*Id.* ¶ 7.)  The man, named Alexander Stinnett, "spoke to [another] African-American man . . . who seemed upset, then [Stinnett] began to talk to [Lee]."  (*Id.*)  A few seconds later, "a second large man joined" the conversation.  (*Id.*)  Unbeknownst to Lee, the men were security guards and told Lee they were "clearing the sidewalk."  (*Id.* ¶ 8.)  Lee told them he was waiting for a ride and refused to leave.  (*Id.*)

Officers Larson, Lawyer, Choy and Cox were stationed in the area.  (*Larson Depo.* [Doc. 42-6] 033:14–25.)  Officers Larson and Lawyer were observing the two security guards telling Lee to leave the area, while Lee was on the phone.  (*Id.* 035:10–19, 037:6–25, 040:14–19, 041:2–7.)  As they observed the interaction, Officer Lawyer told Officer Larson, "so right now we can cite him …, we can cite him for being on the sidewalk," in reference to SDMC § 82.0203.  (*Lawyer BC Video*, 0:00:31-0:00:35; *Lawyer Depo.* [Doc.

---

[4] Portions of Officer Larson's deposition transcript ("Larson Depo.") are attached as Defs' Exhibit 16 [Doc. 42-6] and Pl's Opp'n Exhibit 5 [44-5].  However, Defendants' citations to Larson's deposition are inaccurate.  For example, they cite "53:12-13" to support the claim that Lee told Officer Larson, "no, I'm not moving."  (*See Defs' P&A* [Doc. 42-1] 2:12–13.)  But that portion of the transcript does not support the statement, and instead is part of an attorney's question.  (*See Larson Depo.* [Doc. 42-6] 053:12–13.)  The problem is that most of the pages attached to Defs' Exhibit 16 do not have the transcript page number, only a three-digit "MSJ Exhibit" page number.  For this reason, page references in this order to Def's Exhibit 16 are to the three-digit exhibit page number.  References to Pl's Opp'n Exhibit 5 are to the transcript page number.

44-6] 74:3–22.[5])  Although Lee was refusing to leave, Officer Larson acknowledges that at no time was there any physical fighting or "verbal argument occurring." (*Larson Depo.* []Doc. 42-6] 038:2–15.)

When the security guards could not convince Lee to leave, they motioned to the officers.  (*Lawyer BC Video* 0:00:47–0:00:49.)  Officer Larson approached Lee, who was still on his cell phone with Evans, and said "come here and talk to me, come here and talk to me." (*Larson BC Video* 0:00:47–0:00:48; *Lee Decl.* [Doc. 44-1] ¶ 10.)  At about the same time, an unidentified man in a yellow shirt stepped in and began to move/push Lee from behind away from the security guards.  (*Larson BC Video* 0:00:48–0:00:58; *Lee Decl.* [Doc. 44-1] ¶¶ 10, 11.)  Although the man claimed to know Lee, Lee denies knowing him.  (*Larson BC VIdeo* 0:00:48–0:00:50; *Lee Decl.* [Doc. 44-1] ¶ 10.)

After moving about 10 feet, Lee stopped near a parking meter and told the man that he "was going to stay right here." (*Larson BC Video* 0:01:00–0:01:03; *Larson Depo*. [Doc. 42-6] 044:12–14.)  Officer Lawyer, who was following close behind, told Lee "let's go dude, off the sidewalk.  You gotta move." (*Lawyer BC Video* 0:01:13-0:01:16.)  Lee took a few more steps, then stopped and asked the officers, "to be real, what am I doing right here?" (*Id.* 0:01:20-0:01:23.)  The officers did not respond and instead Officer Lawyer grabbed Lee's right wrist, which was holding Lee's cell phone to his ear.  (*Id.* 0:01:23–0:01:25.)  As Officer Lawyer pulled Lee's wrist in a downward motion, the officer said "do me a favor, put your hands behind your back." (*Id.*)  At the same time, Officer Larson grabbed Lee's left arm and the two officers moved Lee onto the street. (*Lawyer BC Video* 0:01:23-0:01:30; *Larson BC Video* 0:01:20–0:01:41.)

Lee claims he was surprised when Officer Lawyer grabbed his "right wrist and yanked it down from where it was located near my right ear . . . ." (*Lee Decl.* [Doc. 44-1]

---

[5] Portions of Officer Lawyer's deposition transcript are attached as Defs' Exhibit 19 [Doc. 42-9] and Pl's Opp'n Exhibit 6 [Doc. 44-6].

¶ 14.)  The officers repeatedly ordered Lee to put his hands behind his back, while Lee repeatedly asked, "what did I do, what did I do?"  (*Id.*)  As the officers stepped onto the street, Officer Choy also grabbed Lee.  (*Cox BC Video* 0:00:27–0:00:33.[6])  After a few seconds, Officer Choy grabbed Lee around the head and moved him down toward the ground.  (*Id.* 0:00:37–0:00:48; *Lee Decl.* [Doc. 44-1] ¶ 16; *Cox Depo.* [Doc. 42-8] 84:10–22; *Choy Depo.* [Doc. 42-10] 122:11–123:20.[7])

As Lee was taken to the ground, he hit his head causing a large bump.  (*Lee Decl.* [Doc. 44-1] ¶ 16.)  The officers then struggled to move Lee onto his stomach.  (*Cox BC Video* 0:00:50–00:01:47.)  Once Lee was forced onto his stomach, Officer Cox knelt down on Lee's left arm and pinned his bicep.  (*Cox Depo.* [Doc. 42-8] 97:14–25.)  Other officers also appear to be helping pin Lee down.  (*Cox BC Video* 0:01:47–00:01:58.)  Officer Cox then grabbed Lee's left arm, which was pinned under Lee's body, and pulled it in a lifting motion and "torqued" it behind his back so the officers could handcuff Lee.  (*Id.*; *Cox Depo.* [Doc. 42-8] 97:14–98:19; *Lee Decl.* [Doc. 44-1] ¶ 18; *McClain BC Video* 0:03:34–0:03:44.[8])  Officer Cox testified that "it looked like [Lee's] left hand was down toward his waistband," which was "a huge red flag."  (*Cox Depo.* [Doc. 42-8] 97:15–19.)  The officers then handcuffed Lee.  (*Id.* [Doc. 44-8] 101:18–20.)

As Officer Cox was pulling and torqueing Lee's arm behind his back, the officer heard a pop.  (*Cox Depo.* [Doc. 44-8] 98:16–101:8.)  Lee contends at that point he immediately felt severe pain in his left arm and shoulder.  (*Lee Decl.* [Doc. 44-1] ¶ 18.)

---

[6] Officer Cox's body camera video ("Cox BC Video") is Defs' Exhibit 13 [Doc. 42-5] and Pl's Opp'n Exhibit 13 [44-11].

[7] Portions of Officer Cox's deposition transcript are attached as Defs' Exhibit 18 [Doc. 42-8] and Pl's Opp'n Exhibit 8 [Doc. 44-8].  Portions of Officer Choy's deposition transcript are attached as Defs' Exhibit 20 [Doc. 42-10] and Pl's Opp'n Exhibit 7 [Doc. 44-7].)

[8] Officer McClain's Body Camera Video ("McClain BC Video") is attached as Defs' Exhibit 7 [Doc. 42-5].

Lee was taken to the county jail and booked on charges of being drunk in public and resisting arrest. (*Defs' P&A* [Doc. 42-1] 8:4–5; *Pl's Opp'n* [Doc. 44] 4:4–6.) The charges were eventually dropped. (*Lee Decl.* [Doc. 44-1] ¶ 19.)

After being released from jail, Lee was taken to the hospital because he was experiencing severe pain in his upper left arm. (*Lee Decl.* [Doc. 44-1] ¶ 20.) X-rays revealed a displaced, comminuted fracture in five places along his left humerus, that required surgery. (*Id.*; *Dr. David Depo.* [Doc. 44-9] 41:3–25.[9]) The surgery was performed two days later, and required placement of a long, metal plate on the humerus bone and insertion of 16 screws. (*Lee Decl*. [Doc. 44-1] ¶ 21.) At the time, Lee was employed by the San Diego Chargers as a defensive back. (*Id*. ¶ 22.) Lee states that as a result of the injury, subsequent surgery, and lengthy recovery time, he was released by the Chargers. (*Id*.)

On January 23, 2018, Lee filed this lawsuit against the City and the officers involved in his arrest. The Second Amended Complaint asserts causes of action for: (1) 42 U.S.C. § 1983 Civil Rights Violations; (2) Negligence; (3) False Arrest; (4) Battery; (5) Cal. Civil Code § 52.1 (the "Bane Act") Civil Rights Violations; (6) 42 U.S.C. § 1983 (the "Monell" claim) – Unlawful Policy via Unconstitutional Ordinance; and (7) 22 U.S.C. § 2201 – Declaratory Relief. Defendants now move for summary judgment and Lee moves for partial summary judgment of the Monell claim.

## III.   LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the

---

[9] Portions of Dr. Tal. S. David's deposition transcript are attached as Pl's Opp'n Exhibit 9 [Doc. 44-9].

outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  Id. at 322-23.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein."  Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1030 (9th Cir. 2001).  Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact."  Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing Richards v. Combined Ins. Co., 55 F.3d 247, 251 (7th Cir. 1995)).

If the moving party meets its initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995) (citing Anderson, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient.").  Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex, 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party.  See Matsushita, 475 U.S. at 587.  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment."  Anderson, 477 U.S. at 255.

## IV.   DEFENDANTS' SUMMARY JUDGMENT MOTION

Defendants argue the officers are entitled to qualified immunity with respect to Lee's excessive force claim.  Defendants also contend that because the officers did not use excessive force, and had probable cause to arrest Lee, summary judgment is appropriate as to Lee's state-law claims.

### A.   Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  Id.  A public official is entitled to qualified immunity "unless the official's conduct violated a clearly established constitutional right. [Citation omitted.]"  Id. at 232.

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step approach to evaluating qualified immunity.  First, the court must decide if the facts make out a violation of a constitutional right.  Id. at 201.  If so, the second step is whether the right at issue was "clearly established" at the time of the official's alleged misconduct.  Id.  Whether the governing law was clearly established and whether specific facts

constitute a violation of established law are legal determinations.  <u>Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.</u>, 237 F.3d 1101, 1106 (9th Cir. 2001).

### 1.    Was there a violation of a constitutional right?

The first issue is whether, the officers' use of force against Lee violated his Fourth Amendment rights.  In the context of a summary-judgment motion, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the motion.'" <u>Scott</u>, 550 U.S. at 378 (quoting <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962)).  "In qualified immunity cases, this usually means adopting … the plaintiff's version of facts." <u>Id.</u>

In evaluating excessive-force claims, "courts ask 'whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." <u>Glenn v. Washington County</u>, 673 F.3d 864, 871 (9th Cir. 2011).  This involves a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989).  In <u>Graham</u>, 490 U.S. 386 (1989), the Supreme Court explained this requires an examination of the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Id</u> at 396.  Because the determination is based on the totality of the circumstances, courts may also consider other factors relevant to the particular case. <u>Mattos v. Agarano</u>, 661 F.3d 433, 441, 451 (9th Cir. 2011); <u>Davis v. City of Las Vegas</u>, 478 F.3d 1048, 1054-57 (9th Cir. 2007) (recognizing that courts also examine the availability of alternatives to the amount of force used, and the mental and emotional state of the plaintiff).  "Ultimately, 'the most important' *Graham* factor is whether the individual posed an 'immediate threat to the safety of the officers or others." <u>Mattos</u>, 661 F.3d at 441 (citation omitted).

Although a court views evidence in the light most favorable to the non-moving party in summary judgment, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. "Excessive force claims … are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." County of Los Angeles, Calif., v. Mendez, – U.S. –, 137 S.Ct. 1539, 1546–47 (2017) (quoting Saucier, 533 U.S. at 207). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Glenn, 673 F.3d at 871 (quoting Graham, 490 U.S. at 397).

### a.    The nature of the intrusion on Lee's Fourth Amendment rights.

Evaluating the nature of the intrusion on an individual's rights requires an assessment of "the type and amount of force inflicted." Deorle v. Rutherford, 272 F.3d 1272, 1279 (9th Cir. 2001). "Even where some force is justified, the amount actually used may be excessive." Glenn, 673 F.3d at 871. Where the plaintiff suffers a serious injury that is endured for a significant period of time, the nature of the intrusion is severe. See Santos v. Gates, 287 F.3d 846, 853–54 (9th Cir. 2002) (finding nature of intrusion severe where plaintiff suffered broken back after allegedly being shoved to the ground by officers); Palmer v. Sanderson, 9 F.3d 1433, 1436 (9th Cir. 1993) (officer's application of handcuffs tight enough to cause pain and discoloration of wrists for several weeks supported excessive force claim); but see Jackson v. City of Bremerton, 268 F.3d 646 (9th Cir. 2001) (intrusion minimal where plaintiff suffered broken finger and discomfort when pepper spray on her hair ran into her eye).

Here, the amount of force used on Lee caused him to suffer a severe fracture of his left humerus (in five places), requiring the placement of a long, metal plate and insertion of 16 screws. (Lee Decl. [Doc. 44-1] ¶¶ 20, 21; Dr. David Depo. [Doc. 44-9] 41:3–25;

11

*Pl's Opp'n Ex. 10* [Doc. 44-10].)  Lee also contends the Chargers terminated him because of the extended rehabilitation time required for the injury and thus the injury has had a significant impact on Lee.  (*Id.* ¶ 22.)  Under the circumstances, the evidence supports an inference that the intrusion on Lee's Fourth Amendment rights was severe.

### b.    Government's interest in the use of force.

The three <u>Graham</u> factors used to evaluate the government's interest are (1) the nature of the crime, (2) whether plaintiff posed a threat, and (3) whether plaintiff was attempting to flee or resist arrest.  <u>Graham</u>, 490 U.S. at 396.  Because excessive force claims are evaluated under the totality of the circumstances, courts also "consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'"  <u>See</u> <u>Mattos</u>, 661 F.3d at 441 (quoting <u>Bryan v. MacPherson</u>, 630 F.3d 805, 826 (9th Cir. 2010)).   In evaluating each factor, disputes must be resolved in Lee's favor.  <u>Scott</u>, 550 U.S. at 378 ("courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the motion'").

### (i)    Nature of the crime

Defendants do not specifically address the nature of the crime in discussing the excessive-force claim.  However, in other sections of their motion, Defendants contend they had grounds for detaining Lee for public intoxication and resisting arrest.  (*Defs' P&A* [Doc. 42-1] 20:20–21:17.)  Lee disputes he was detained for public intoxication and argues the crime at issue was the "*de minimis* offense" of standing on the sidewalk in violation of SDMC § 82.0203.  (*Opp'n* [Doc. 44] 8:21–9:6.)

Lee's contention that he was detained for violating § 82.0203 is supported by the evidence.  Body-camera video establishes that before the officers approached Lee, Officer Lawyer told Officer Larson, "so right now we can cite him …, we can cite him for being on the sidewalk."  (*Lawyer BC Video*, 0:00:31-0:00:35.)  Approximately 15 seconds later, the two officers approached Lee and warned that Lee "is going to go with

12

us" if he does not leave.  (*Id.* 0:00:56–0:00:58.)  Approximately 30 seconds later, Officer Lawyer grabbed Lee's right wrist and ordered him to "put your hands behind your back." (*Id.* 0:01:23-0:01:25.)  And during Officer Lawyer's deposition, he confirmed his "plan was to . . . detain [Lee] and . . . move him off the sidewalk" to write him a citation for "standing on the sidewalk in a business district."  (*Lawyer Depo.* [Doc. 44-6] 74:3–22.)

These facts support Lee's contention that he was detained for the minor offense of violating SDMC § 82.0203.  Because the nature of this crime does not suggest "a danger to [officers] or the public such that there would be a heightened interest in the use of force to subdue him, the 'severity of the crime at issue' weighs against a finding that the government had an interest in the use of significant force."  Young v. County of Los Angeles, 655 F.3d 1156, 1165 (9th Cir. 2011).[10]

### *(ii)    Threat to officers*

Defendants' contention that the amount of force used was reasonable is largely based on their claim that Lee posed a significant threat to "everyone's safety" and that the officers were forced to "react in a split second given Plaintiff's sudden physical resistance of them as they attempted to handcuff him . . . ."  (*Defs' P&A* [Doc. 42-1] 15:18–21.)

"[A] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."  Young, 655 F.3d at 1163 (quoting Deorle, 272 F.3d at 1281).  Here, viewing the evidence in the

---

[10] Even if the Court accepted Defendants' claim that Lee was detained for public intoxication, it is not a serious crime for purposes of evaluating an excessive-force claim.  See Santos, 287 F.3d at 854 (finding public intoxication does not constitute a serious crime).  Regarding the resisting-arrest charge, because the officers' use of force preceded Lee's resistance, it would not justify their decision to use force.  See Young, 655 F.3d at 1164 (evaluating severity of crimes committed before officer's use of force). Additionally, the type of resistance offered by Lee would not suggest a serious crime weighing in favor of significant force.  See discussion in section IV.A.1.b(iii), below.

light most favorable to Lee, a reasonable jury could conclude he did not pose a danger to the officers or others.

The officers' body camera videos show that while interacting with the security guards, Lee never became hostile or aggressive towards them, never took a fighting stance, never clenched his fists or made threatening gestures, and he never used profanity. (*Larson's BC Video* 0:00:00-0:00:48; *Lawyer BC Video* 0:00:00-0:00:50.)  Instead, during the entire interaction, Lee stood calmly, with his right hand holding his cell phone to his ear and his left hand generally in his jean's pocket.  (*Id.*)  Officer Larson confirmed during his deposition that although Lee refused the security guards' orders to leave, there was no physical fighting or "verbal argument occurring."  (*Larson Depo.* [Doc. 42-6] 038:2–15.)

There is also no dispute that when the officers approached Lee, he complied with their orders to move, until he stopped and asked what he was doing wrong.  Officer Larson's body camera video shows that when he approached Lee and said "come here and talk to me, come here and talk to me" (*Larson's BC Video 1* 0:00:47-0:00:48), Lee moved approximately 10 feet away from the security guards (*Id.* 0:00:49–0:01:00). When Lee stopped moving, Officer Lawyer told him "let's go dude, off the sidewalk man. You gotta move" (*Lawyer BC Video* 0:01:13-0:01:16), and Lee again moved a few more short steps before stopping and asking the officers, "to be real, what am I doing right here?"  (*Lawyer BC Video* 0:01:20-0:01:23.)

In his deposition, Officer Larson admitted Lee was "technically" doing what the officers asked him to do.  (*Larson Depo.* [Doc. 44-5] 61:21–62:4.)  Additionally, the body-camera videos confirm that before the officers grabbed Lee, he was not hostile or aggressive toward the officers, he did not take a fighting stance toward them, he made no threatening gestures, and he never clenched his fists or used profanity. (*Larson's BC Video* 0:00:00-0:01:24; *Lawyer's BC Video* 0:00:00-0:01:25.)  And the audio from the body-camera videos reveals that at no point before the officers grabbed Lee, had he refused the officers' orders to move.  (*Id.*)

14

At worst, after moving approximately 12 to 15 feet from the security guards, Lee stopped and asked what he was doing wrong.  Asking why the officers were ordering him to "move" and get "off the sidewalk" did not make Lee hostile or render him a danger.  See Houston v. Hill (1987) 482 U.S. 451, 462–63 (1987) ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."); People v. Quiroga, 16 Cal.App.4th 961, 966 (1993) ("While the police may resent having abusive language 'directed at them, they may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment.'") (quoting Duran v. City of Douglas, Ariz., 904 F.2d 1372, 1378 (9th Cir. 1990).)  This is particularly true in this case, where the officers were ordering Lee to "move" from a designated passenger loading zone while Lee was waiting for a ride.[11]

Defendants respond that Lee never told them he was waiting for a ride.  (*Defs' Reply* [Doc. 47] 2:5–11.)  But a reasonable jury could find the officers' failure to discover that Lee was waiting for a ride was unreasonable given: (1) Lee had already told the security guards he was waiting for a ride (*Lee Decl.* [Doc. 44-1] ¶ 8); (2) the area was a designated passenger loading zone; (3) Lee asked the officers what he was doing wrong and, thus, attempted to figure out why he was being asked to move; and (4) the officers chose not to respond to Lee's question and instead detain him.

Defendants next argue the amount of force used to pull and twist Lee's arm was justified because the officers believed he might have a weapon hidden in his waistband.  (*Defs' P&A* [Doc. 42-1] 7:7–8, 14:27–28.)   As it turned out, Lee did not have a weapon and thus the officers were mistaken.  In evaluating the immediacy of a suspect's threat,

---

[11] Nor were the officers' orders for Lee to leave the area justified under SDMC § 82.0203.  The ordinance provides, "it shall be unlawful for any pedestrian to stand on the sidewalk, *except as near as practicable to the building or the curb line*."  Id. (emphasis added).  Thus, under the ordinance, the officers should have ordered Lee to move away from the middle of the sidewalk and stand "as near as practicable" to the building line or curb line.

the issue is not whether the officer made an honest mistake of fact, but rather "whether a reasonable officer would have or *should* have accurately perceived that fact." Nehad v. Browder, 929 F.3d 1125, 1133 (9th Cir. 2019). Thus, the issue is whether—viewing the facts in favor of Lee—a reasonable officer would have or should have known that Lee did not have a weapon hidden in his waistband.

The officers' body-camera videos confirm that none of the officers ever said anything suggesting they believed Lee had a weapon. Moreover, there is nothing on the videos suggesting he had a weapon. For example, the video of Lee talking to the security guards shows him wearing snug fitted jeans and a shirt, with no bulges consistent with a weapon around his waistband. (*Lawyer BC Video* 0:00:00–0:00:50; *Larson BC Video* 0:00:00–0:00:48.) Even more revealing is video of the front of Lee's waistband while he was lying on his side, *before* Lee was forced onto his stomach. (*Cox BC Video* 0:00:50–0:00:54.) Lee's stomach is visible on the video, and there is no weapon in his waistband. (*Id.*) For these reasons, whether the officers truly and reasonably believed Lee had a weapon is a question for the jury.

Finally, Defendants attempt to justify the use of force by asserting they were required to make a split-second decision. The "desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." Glenn, 673 F.3d 876–77 (quoting Deorle, 272 F.3d at 1281. In Nehad, 929 F.3d 1125, the Ninth Circuit recently explained that the latitude Graham requires for split-second judgments does not apply where the officer creates the sense of urgency:

> We recognize, as we have often done before, that officers must act "without the benefit of 20/20 hindsight," and must often make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Gonzalez v. City of Anaheim, 747 F.3d 789, 794 (9th Cir. 2014) (quoting Graham, 490 U.S. at 396–97, 109 S.Ct. 1865); see also Deorle v. Rutherford, 272 F.3d 1272, 1283 (9th Cir. 2001). Sometimes, however, officers themselves may "unnecessarily create their own sense of urgency."

1
2
3
4
5

> Torres v. City of Madera, 648 F.3d 1119, 1127 (9th Cir. 2011); see also
> Porter v. Osborn, 546 F.3d 1131, 1141 (9th Cir. 2008) ("When an officer
> creates the very emergency he then resorts to deadly force to resolve, he is
> not simply responding to a preexisting situation.").  Reasonable triers of fact
> can, taking the totality of the circumstances into account, conclude that an
> officer's poor judgment or lack of preparedness caused him or her to act
> unreasonably, "with undue haste." Torres, 648 F.3d at 1126.

6

Id. at 1135 (footnote and internal brackets excluded).

7
8
9
10
11
12
13
14
15
16
17
18
19

Here, a reasonable jury could find the officers unnecessarily created their own sense of urgency.  As discussed above, a reasonable jury could find Lee did not pose a threat and that he had complied with the officers' orders to move before stopping to ask what he was doing wrong.  While the officers appear to have been frustrated that Lee did not continue walking away from the area (see Larson Depo. [Doc. 44-5] 61:21–62:4), the videos establish the officers moved to detain Lee approximately 30 seconds after they first ordered him to "move" (Lawyer BC Video 0:00:50–0:01:23; Larson BC Video 0:00:48–0:01:19).  Because nothing occurred during those 30 seconds suggesting the officers needed to resolve the situation quickly, a reasonable jury could find the officers acted impetuously.  Under these facts, the "latitude Graham requires for split-second police judgments in 'tense, uncertain, or rapidly evolving' situations was not warranted here." Blankenhorn, 485 F.3d at 478 (citing Graham, 490 U.S. at 396–97).[12]

20
21

### (iii) *Resisting arrest or attempting to flee.*

22
23

Relying on the body camera videos, the officers contend Lee was "physically, actively resisting them all of sudden when they got close to him to try and handcuff him."

24
25
26
27
28

[12] The Court recognizes the officers allege other facts suggesting Lee posed more of a danger.  Those facts cannot be considered if Lee disputes them and his dispute is supported by evidence, or it is unclear whether the officer was aware of the facts when they grabbed Lee.  Glenn, 673 F.3d at 873, n. 8 ("We cannot consider evidence of which the officers were unaware").)

(*Defs' P&A* [Doc. 42-1] 16:16–19.)  Although Lee appears to be resisting at certain points during his arrest, the extent of his resistance is in dispute.

As an initial matter, despite Defendants' reliance on the body-camera videos, they are of limited assistance, particularly in evaluating Lee's resistance.  There is no single video that shows the entire arrest, nor can the entire arrest be seen by piecing together the videos from the officers' body cameras.  Additionally, the videos from Officer Lawyer's and Officer Larson's body cameras do not show the arrest because (1) they were standing too close to Lee and (2) their body cameras fell off shortly after grabbing him.  Videos from the other officers' body cameras only show snippets of the arrest.  Aside from not having a clear video of the entire arrest, the officers concede the type of resistance Lee is accused of—tensing his arms, as opposed to punching, kicking or biting—is difficult to discern on videos.  (*See Choy Depo.* [Doc. 42-10] 123:14–20, acknowledging the videos do not show muscle rigidity, how hard someone "is grabbing, or flinching, or pulling away, what level of resistance there is.")

Defendants' contention that Lee actively resisted the officers "when they got close to him" is also not supported by the videos.  As discussed above, the videos show Lee was not aggressive toward the officers at any time before the officers grabbed his arms.  The videos also show that when Officer Lawyer grabbed and pulled Lee's right wrist in a downward motion, Lee did not try to yank his arm away but appears to try to move his arm/hand back up toward his face.  (*Larson BC Video* 0:01:19–0:01:26; *Lawyer BC Video* 0:01:22–0:01:28.)  It is, therefore, not clear that Lee was "resisting" Officer Lawyer.  Similarly, Lee does not appear to be resisting when the officers moved him onto the street.  (*Cox BC Video* 0:00:27–0:00:33.)

Once Lee was taken to the ground and laying on his side, he appears to resist being forced onto his stomach.  However, it is often difficult to see what is happening while the officers are forcing Lee onto his stomach and *before* they break his humerus.  The officers contend, however, that they can be heard yelling at Lee to stop resisting.  (*Defs' P&A* [Doc. 42-1].  But bystanders can also be heard yelling at the officers that Lee was

not resisting.  (*Larson BC Video* 0:02:01–0:02:03, 0:02:12–0:02:18, 0:03:40–0:03:48, 0:04:03–0:04:06.)  Lee also contends he was not resisting and claims that while on his stomach, his arms were "underneath my body and one or more officers were on my back pinning me down.  As a result, my arms were trapped under my body, and I could not get them out and put them behind my back."  (*Lee Decl.* [Doc. 44-1] ¶ 17.)  Officer Cox testified that before torqueing Lee's left arm behind his back, Lee's left hand was "pinned down" under his body weight while the officer knelt on Lee's left arm.  (*Cox's Depo.* [Doc. 42-8] 97:23–98:15.)  Officer Cox's testimony arguably corroborates Lee's claim.

In summary, although Lee appears to resist the officers at certain points during his detention/arrest, disputes exist regarding the extent of Lee's resistance.  Under these circumstances, a reasonable jury could find Lee's limited resistance did not justify the amount of force used.[13]

### (iv)    Other factors.

Because excessive force claims must be evaluated under the totality of the circumstances, courts "consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'"  See Mattos, 661 F.3d at 441 (quoting Bryan, 630 F.3d at 826).  Another factor considered in evaluating excessive-force claims is "whether there were less intrusive means of force that might have been used before officers resorted" to the force used.  Glenn, 673 F.3d at 876.  "Officers 'need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act with that range of conduct we identify as reasonable."  Id. (quotation omitted).  "'However, police are required to consider what other tactics if any were available,' and

---

[13] Under Blankenhorn, it is also possible that Lee's resistance to being forced onto his stomach was "justified."  Id., 485 F.3d at 479–80 (officers' "lack of forewarning, the swiftness, and the violence with which the[y] threw themselves upon [plaintiff] could reasonably be considered 'provocative,' triggering [plaintiff's] limited right to reasonable resistance").  See discussion in section IV.A.2, below.  However, given the Court's excessive force findings, the issue need not be decided.

if there were 'clear, reasonable and less intrusive alternatives' to the force employed, that 'militates against finding the use of force reasonable.'" Id. (citation, brackets and some internal quotation marks omitted).

Here, Lee's police practices and procedure expert, Jeffrey Noble, opined that under the circumstances, a "reasonable officer would know that he was required to use verbal communication and de-escalation techniques prior to resorting to the use of force." (*Noble Decl.* [Doc. 44-3] ¶ 14.) He also opined that the officers failed to follow their training when they stopped communicating with Lee and began to forcibly detain him. For support, Noble cites San Diego Police Department Policy No. 4.01, relating to stopping and detaining subjects. The policy provides:

> The Department understands that direct contact with officers is, to the vast majority of the public, a rare and infrequent event. As a consequence, such contact can often be uncomfortable, awkward, or unnerving for citizens *when they do not know why they are being contacted*. A way to alleviate this is to provide citizens being contacted with the reasons for the interaction. Officers should communicate the reasons for the necessity of contact with citizens to the extent that this is possible, in light of investigatory and safety concerns.

(*Noble Decl.* [Doc. 44-3] ¶ 18 (emphasis added).[14])

As discussed above, the evidence establishes that Lee was waiting for a ride in an area designated as a passenger loading zone when the officers ordered him to "move" and "get off the sidewalk." The evidence further establishes that after moving approximately 12 to 15 feet, Lee stopped and asked what he was doing wrong. Rather than "communicate the reasons" Lee was being asked to move, the officers resorted to force, grabbing Lee's arms and moving him onto the street. Under these circumstances, a reasonable jury could find that based on Noble's opinion, there were reasonable and less intrusive alternatives to the force used. See Smith v. City of Hemet, 394 F.3d 689, 703

---

[14] Jeffrey Noble's declaration is attached as Exhibit 3 [Doc. 44-3] to Marrinan's Opp'n Decl. [Doc. 44-12].

(9th Cir. 2005) (finding that a jury could rely upon plaintiff's expert regarding whether the officers' conduct violated applicable police standards and that there were alternative techniques available for subduing him); see also Larez v. City of Los Angeles, 946 F.2d 630, 635 (9th Cir. 1991) (finding testimony of "an expert on proper police procedures and policies" was relevant and admissible).

Defendants argue in their reply, however, that the officers decided to use force "only after Plaintiff was warned and given the opportunity to leave…." (*Reply* [Doc. 47] 5:12–13.) But the videos establish that Lee moved when the officers approached him and ordered him to do so. (*Lawyer BC Video* 0:00:50–0:01:23; *Larson BC Video* 0:00:48– 0:01:19.) Officer Larson acknowledged as much in his deposition. (*Larson Depo.* [Doc. 44-5] 61:21–62:4.) And the videos confirm Lee never told the officers he would move no further; at most, he stopped to ask what he was doing wrong. Additionally, the videos establish that within 30 seconds of approaching Lee and asking him to move, the officers grabbed his arms and forced him onto the street. Because Lee's "opportunity to leave" lasted less than 30 seconds, a jury could find the officers did not follow SDPD Policy No. 4.01, and that there were clear, reasonable and less intrusive alternatives to the force used against Lee.

### 2.    Was the law clearly established?

In evaluating whether a right is "clearly established," the "relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. In determining whether a right is clearly established, courts "may look at unpublished decisions and the law of other circuits, in addition to Ninth Circuit precedent." Prison Legal News v. Lehman, 397 F.3d 692, 702 (9th Cir. 2005); Sorrels v. McKee, 290 F.3d 965, 970 (9th Cir. 2002) (looking to "decisions of our sister Circuits, district courts, and state courts" in evaluating if law was clearly established).

"[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." Plumhoff v. Rickard, 134 S.Ct. 2012, 2023 (2014).  However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

In support of the argument that the law was clearly established, Lee relies on Blankenhorn v. City of Orange, 485 F.3d 463.  There, Officer Nguyen found plaintiff Blankenhorn, a known gang member, at a shopping mall from which he had previously been evicted and banned.  Id. at 467, 468.  The officer yelled at him to come over, but Blankenhorn asked why and continued talking with a friend.  Officer Nguyen stared at Blankenhorn, who eventually said, "what's up? You want to talk to me, come over here, talk to me, then." Id. at 468–69.  When Officer Nguyen did not respond, Blankenhorn began to walk away and the officer moved in front of Blankenhorn and grabbed his arm. Blankenhorn yanked his arm away, and Officer Nguyen threatened to spray him with mace.  At that point, other officers and a security guard arrived.  Blankenhorn admitted he was "'angry' and 'loud,' that he used profanity and, in frustration, he threw his driver's license on the ground." Id. 469.  Video also showed him "gesture several times by raising his arms above his head and touching his chest.  It also show[ed] him approach Nguyen and once point at him.  But it does not show Blankenhorn clench his fists." Id. Officer Nguyen then ordered Blankenhorn to kneel down so he could handcuff him. Blankenhorn refused, saying "I'm not going to my f***ing knees" and immediately three officers jumped on him.  Id.   After struggling for several seconds, the officers tackled Blankenhorn, handcuffed him and secured his wrists and ankles with rip-hobble restraints.  Id.  During the struggle, Nguyen punched Blankenhorn several times in an attempt to distract him from resisting, while another officer placed a knee behind his neck

and pressed his face to the ground.  Id. 469-70.  There was no indication Blankenhorn suffered any serious injuries.

The officers filed a summary-judgment motion seeking, among other things, qualified immunity on the excessive-force claim.  Applying the Graham factors, the Ninth Circuit found the severity of the alleged crime—misdemeanor trespass—was minimal.  Id. at 478.  Additionally, although Blankenhorn was a known gang member who yanked his arm away from Nguyen, threw his identification on the ground, yelled, cursed, and raised his arms above his head and pointed at the officers, the court concluded a rational jury could find Blankenhorn did not pose a serious threat to anyone's safety.  Id.  This was supported by Blankenhorn's previous cooperative behavior with the officers, his demeanor when Nguyen found him at the mall, and his behavior during the detention.  Id.  Regarding the third Graham factor, the court acknowledged that Blankenhorn resisted and tried to stay on his feet when the officers tried to take him to the ground.  Id. at 480.  However, the court stated that "a person has a 'limited right to offer reasonable resistance to an arrest that is the product of an officer's personal frolic.  That right is not triggered by the absence of probable cause, but rather by the officer's bad faith or provocative conduct."  Id. at 479 (quoting United States v. Span, 970 F.2d 573, 580 (9th Cir. 1992)).  Given the "lack of forewarning, the swiftness, and the violence with which the defendant officers threw themselves upon Blankenhorn," the court found the officers' "conduct could reasonably be considered 'provocative,' triggering Blankenhorn's limited right to reasonable resistance . . . ."  Id. at 479–80.  Additionally, because there was no evidence "Blankenhorn struck out at any of the officers or mall patrons . . . [c]onsidering the rapidity of the officers' actions and the restrained nature of Blankenhorn's own response, a jury could conclude Blankenhorn's resistance was reasonable under the circumstances."  Id. at 480.  The Ninth Circuit, therefore, concluded the officers were not entitled to qualified immunity for the excessive force claim.

Defendants argue <u>Blankenhorn</u> does not satisfy the clearly-established prong because it "does not present similar circumstances." (*Defs' Reply* [Doc. 47] 6:25–28.) Specifically, Defendants contend <u>Blankenhorn</u> is distinguishable because it did not involve the same type of force as this case and instead involved gang tackling, punches and hobble restraints. (*Defs' Reply* [Doc. 47] 6:25–28.)

To satisfy the clearly-established prong, previous cases do not have to involve the identical conduct. "The focus is on whether the officer had fair notice that the officer's conduct was unlawful." <u>Rodriguez v. County of Los Angeles</u>, 891 F.3d 776, 795 (9th Cir. 2018) (citation and brackets omitted). <u>Blankenhorn</u> provided fair notice to the officers that the amount of force used—under Lee's version—was unreasonable.

First, contrary to Defendants' contention, <u>Blankenhorn</u> is factually analogous to this case. Both cases began with officers observing plaintiffs as they conversed with third parties; neither case involved the use of a weapon; the use of force began with an officer grabbing each plaintiff by the arm; each involved multiple officers tackling and pinning plaintiffs to the ground; the crimes at issue were minor offenses; and both Blankenhorn and Lee offered some resistance to being taken to the ground.

Second, the distinctions that do exist between the two cases further support a finding that <u>Blankenhorn</u> satisfies the clearly-established prong. As described by the Ninth Circuit, Blankenhorn's conduct toward the officers was far more aggressive and hostile than Lee's conduct toward the officers and security guards. While Lee was calm and compliant with the officers before the use of force, Blankenhorn—a known gang member—was verbally abusive, threw his identification on the ground, made taunting gestures toward Officer Nguyen by raising his arms and pointing at him, and "yanked" his arm away from the officer when he attempted to stop him from walking away. Additionally, while the force used on Blankenhorn did not cause any severe injuries, here, Lee suffered a severe fracture to his humerus. Finally, while Blankenhorn was being detained for trespassing, Lee was being detained for standing on the sidewalk in a designated passenger loading zone. In sum, to the extent the officers' use of force against

Blankenhorn was excessive, there can be no doubt the officers' use of force against Lee was excessive.[15]

### B. Negligence and battery causes of action

Defendants argue summary judgment is warranted against Lee's negligence and battery causes of action. Their argument is based on the theory that the force used to detain/arrest Lee was reasonable. Because the Court has found disputed issues of fact preclude a finding that they did not use excessive force, Defendants' argument regarding the negligence and battery causes of action fail.

### C. False arrest/false imprisonment cause of action

To prevail on his claim for false arrest/false imprisonment, Lee must establish the following: "(1) the nonconsensual intentional confinement of a person; (2) without lawful privilege; and (3) for an appreciable period of time, however brief." Lyons v. Fire Ins. Exchange, 161 Cal.App.4th 880, 888 (2008). California law provides an absolute defense "where the officer, acting within the scope of his or her authority, either (1) effects a lawful arrest or (2) has reasonable cause to believe the arrest is lawful." Cervantes v. United States, 330 F.3d 1186, 1188 (9th Cir. 2003). "Probable cause exists when, under the totality of the circumstances known to the arresting officers (or within the knowledge of the other officers at the scene), a prudent person would believe the suspect had committed a crime." Blankenhorn, 485 F.3d at 471 (citing Dubner v. City & Cnty. of San Francisco, 266 F.3d 959, 966 (9th Cir. 2001)). Probable cause to arrest is

---

[15] Defendants also contend the law could not have been clearly established under Luchtel v. Hagemann, 623 F.3d 975 (9th Cir. 2010). But unlike Lee, the plaintiff in Luchtel used crack cocaine, went "ballistic" when officers arrived at the scene because she thought they were there to kill her, and admitted doing "everything she could to keep officers from handcuffing her." Id. at 977. Under those circumstances, the Ninth Circuit found all three Graham factors supported the use of force. Luchtel, therefore, bears no resemblance to this case.

based on an objective standard.  United States v. Lopez, 482 F.3d 1067, 1072 (9th Cir. 2007).   Thus, "[p]robable cause exists when, at the time of arrest, the agents know reasonable trustworthy information sufficient to warrant a prudent person in believing that the accused had committed or was committing an offense."  Allen v. City of Portland, 73 F.3d 232, 237 (9th Cir. 1995); Aguilera v. Baca, 394 F. Supp. 2d 1203, 1214 (C.D. Cal. 2005) ("Probable cause exists when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe that the suspect has committed, is committing, or is about to commit an offense.") (internal quotations and citation omitted).

Here, Defendants argue they had probable cause to arrest Lee for violating Cal. Penal Code § 647(f) and Cal. Penal Code § 148(a)(1).  Under section 647(f), it is a misdemeanor if a person "by reason of his or her being under the influence of intoxicating liquor, any drug, controlled substance, toluene, or any combination of any intoxicating liquor, drug, or toluene, interferes with or obstructs or prevents the free use of any street, sidewalk, or other public way."  With respect to this crime, Defendants contend there is no dispute that while "asking [Lee] to move from the area, Officer Larson . . . had observed that [Lee] had blood shot eyes and had an odor of alcohol." (Defs' P&A [Doc. 42-1] 20:25–26.)  Defendants further contend Lee "was clearly intoxicated and admitted that he had '5 shots' to drink between 9:00 p.m. and the time he encountered the officers," which was more than five hours later.  (Id. 20:27–28.)

Disputed issues of material fact exist regarding whether at the time of the arrest Officer Larson had probable cause to arrest Lee for violating section 647(f).  Before detaining/arresting Lee, the officers are heard on the video talking about citing Lee for standing on the sidewalk.  Aside from this discussion, there is no nothing suggesting the officers were considering citing Lee for public intoxication.  Additionally, at no point before detaining Lee did any of the officers suggest that Lee's eyes appeared blood shot or that he had an odor of alcohol.  Nor is it clear from the video that Lee's eyes were bloodshot.  (Lawyer BC Video 0:00:00–0:01:23; Larson BC Video 0:00:00–0:01:19.)

26

Moreover, Defendants' assertion that Lee had "5 shots" between 9:00 p.m. and approximately 2 a.m. when he encountered the officers is based on Lee's interview *after* his arrest.  For these reasons, the Court finds disputed issues of fact exist regarding whether Officer Larson had probable cause to arrest Lee for violating section 647(f).

Under Cal. Penal Code § 148(a)(1), it is a crime for any person who "willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician . . . in the discharge or attempt to discharge any duty of his or her office or employment . . . ."  Defendants contend the officers had probable cause to arrest Lee for violating this section because the "Officers asked [Lee] several times to continue walking and to leave the area, while warning him that if he did not move, he would be placed in handcuffs and taken to jail."  (*Defs' P&A* [Doc. 42-1] 21:7–9.)  Defendants further contend that in response to their "command to put his hands behind his back, Plaintiff tensed his arms and pulled them in front of his body."  (*Id.* 21:10–11.)

As discussed at length above, there is a dispute regarding whether Lee failed to comply with the officers' commands based on (1) Officer Larson's admission during his deposition that Lee "technically" complied when the officers told him to move and (2) the video showing Lee move approximately 12 to 15 feet after being approached by the officers.  The video also reveals Lee never refused the officers' orders to move.  Although he stopped to ask what he was doing wrong, it is reasonable to infer that Lee would have continued moving once the officers explained why he had to leave the area.  See Matsushita, 475 U.S. at 587 (the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party).  Also undisputed is that Lee was in a designated passenger loading zone waiting for a ride, and the ordinance that the officers sought to enforce did not require Lee to leave the area, but instead to stand "as near as practicable to the adjacent building or curb line."  For all these reasons, the Court finds disputed issues of fact preclude a finding the officers had probable cause to arrest Lee for violating section 148(a)(1).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### D.    Bane Act cause of action

Lee contends the officers violated California's Bane Act, which was enacted to address hate crimes.  Reese v. County of Sacramento, 888 F.3d 1030, 1039 (9th Cir. 2018).  The law provides for a claim against anyone who interferes with an individual's rights secured by federal or state law, "where the interference is carried out 'by threats, intimidation or coercion.'"  Id. at 1040, citing Cal. Civ. Code § 52.1.

Defendants raise two issues regarding Lee's Bane Act claim.  First, they contend there is "no evidence of any 'threats, intimidation or coercion' separate and independent from Plaintiff's detention or arrest."  (Defs' P&A [Doc. 42-1] 22:24–25.)  Defendants argument lacks merit because in the context of an excessive force claim, "§ 52.1 does not require proof of coercion beyond that inherent in the underlying violation."  Rodriguez, 891 F.3d at 802; see also Reese, 888 F.3d at 1043 ("the Bane Act does not require the 'threat, intimidation or coercion' element of the claim to be transactionally independent from the constitutional violation alleged").

Next, Defendants contend the videos from the body-worn cameras establish there were no "threats, intimidation, and coercion."  (Defs' P&A [Doc. 42-1] 22:25–27.)  The Court agrees with Defendants' contention that based on the videos, the officers did not violate the Bane Act.

In Reese, the Ninth Circuit explained that under Cornell v. City and County of San Francisco, 17 Cal.App.5th 766 (2017), the "threat, intimidation, and coercion" language gives rise to a requirement of "a specific intent to violate" the right at issue:

> Cornell explained that "[p]roperly read, the statutory phrase 'threat, intimidation or coercion' serves as an aggravator justifying the conclusion that the underlying violation of rights is sufficiently egregious to warrant enhanced statutory remedies, beyond tort relief." Id. at 383. Accordingly, Cornell held that "the egregiousness required by Section 52.1 is tested by whether the circumstances indicate the arresting officer had a specific intent to violate the arrestee's right to freedom from unreasonable seizure." Id. at 384. In so holding, Cornell adopted the specific intent standard established in Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945),

for assessing criminal violations of federal civil rights. 225 Cal.Rptr.3d at 384–85.

Id. at 1043.

Here, the videos establish that before approaching Lee, Officer Larson and Officer Lawyer agreed to "give it a minute" to see if the security guards could persuade Lee to leave. (*Larson BC Video* 0:00:32–0:00:34.)  After approaching Lee, the officers stated that if he did not move and get off the sidewalk, Lee was going to go with us. (*Lawyer BC Video* 0:00:54–0:00:58.)  When Lee stopped to ask what he was doing wrong, Officer Lawyer says "do me a favor, put your hands behind your back." (*Lawyer BC Video* 0:01:23–0:01:25.)  The video also shows that when the officers tackled Lee, they attempted not to slam him to the ground, but instead to tackle him in a controlled manner. (*Cox BC Video* 0:00:37–0:00:48; *Choy Depo.* [Doc. 42-10] 122:11–123:20.)  Although this Court believes that based on Lee's version of events a reasonable jury could find the force used was ultimately unreasonable under the circumstances, there is simply nothing on the videos suggesting the officers had the specific intent to violate Lee's Fourth Amendment rights.  For this reason, the Court finds Defendants' are entitled to summary judgment on Lee's Bane Act cause of action.

### E.   **Punitive damages**

In a single paragraph, Defendants argue summary adjudication of Lee's punitive damage claim is warranted because there is no evidence indicating the officers were motivated by evil motive, an intent to harm Lee or a reckless or callous indifference to his federally protected rights. (*Defs' P&A* [Doc. 42-1] 23:11–20.)  Lee's similarly abbreviated response asserts under his version of the facts a rational jury could find that the officers acted at least with "reckless or callous indifference." (*Pl's Opp'n* [Doc. 44] 25:13–22.)

The Court finds the facts—even under Lee's version—do not support a finding the officers were motivated by evil motive or an intent to harm.  However, with regard to the

"reckless or callous indifference" standard, Defendants—as the moving party—have not identified any cases providing guidance regarding its application.  Accordingly, given the substantial number disputed facts regarding Lee's arrest, the Court finds Defendants have not satisfied their burden of establishing summary adjudication is appropriate with respect to Lee's punitive damage claim.

## V.   PLAINTIFF'S PARTIAL SUMMARY JUDGMENT MOTION

### A.   Lee has standing to challenge SDMC § 82.0203

Municipalities "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . .  the action is one that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  Monell v. Dept. of Social Services of N.Y., 436 U.S. 658, 690 (1978).  "[A] plaintiff must show 'a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'"  Mendiola-Martinez v. Arpaio, 836 F.3d 1239, 1247 (9th Cir. 2016) (quoting Castro v. City of Los Angeles, 833 F.3d 1060, 1075 (9th Cir. 2016)).  "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."  Bd. of the Cnty. Comm'rs v. Brown, 520 U.S. 397, 405 (1997).  However, "[w]here a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward."  Id. at 404 (emphasis in original).  Where fault and causation are obvious, "proof that the municipality's decision was unconstitutional would suffice to establish that the municipality itself was liable for the plaintiff's constitutional injury."  Id. at 406.

Here, Lee contends Officer Lawyer decided to detain him for violating SDMC § 82.0203.  Lee's contention is supported by the evidence, including Officer Lawyer's

deposition testimony.  In response, Defendants contend Lee lacks standing because they also had grounds to detain Lee for violating Cal. Penal Code §§ 148(a)(1) and 647(f).

As discussed above, Officer Lawyer acknowledged that when he grabbed Lee's arm, he did so to detain him for violating section 82.0203.  Before Officer Lawyer moved to detain Lee for violating that section, there is nothing on the videos remotely suggesting any officer considered detaining Lee for violating sections 647(f) or 148(a)(1).  Moreover, Lee's subsequent arrest for violating those two sections was based on events or facts—i.e, Lee's alleged resistance and admission to consuming alcohol—obtained *after* Officer Lawyer moved to detain Lee for violating section 82.0203.  There is also no dispute that Lee was injured during the detention that Officer Lawyer initiated pursuant to section 82.0203.  In sum, Lee "claims that a particular municipal action [i.e., the ordinance] violates federal law" and enforcement of that ordinance caused his injury.  Because Lee's claim is supported by the undisputed facts, under <u>Brown</u>, 520 U.S. 405, Lee has standing to pursue his <u>Monell</u> claim.


### B.     SDMC § 82.0203 is unconstitutionally vague.

A criminal law "may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of a liberty interest."  <u>City of Chicago v. Morales</u>, 527 U.S. 57, 52 (1999) (citing <u>Kolender v. Lawson</u>, 461 U.S. 352, 357 (1983)).  Under the void for vagueness doctrine, a penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  <u>Kolender</u>, 461 U.S. at 357.  "Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, we have recognized recently that the more important aspect of the vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement."  <u>Id.</u> at 357–58.

Here, SDMC § 82.0203 provides, "[i]n the Central Traffic District, or any business district, it shall be unlawful for any pedestrian to stand on the sidewalk, except as near as practicable to the building line or curb line." (*Defs' Ex. 24* [Doc. 42-14] MSJ Ex. 24-0210.)  Lee contends the ordinance is unconstitutionally vague because it fails to provide the public with adequate notice of the conduct it criminalizes, and it fails to provide guidance to law enforcement, thereby allowing for arbitrary enforcement.  (*Pls' P&A* [Doc. 43-1] 6:22–23, 9:24–25.)  In support of this argument, Lee contends the "ordinance provides no guidelines for police officers to determine when a person is standing 'as near as practicable' to a building line or curb line and thus acting lawfully, or when he may be too far from the building or curb line, and thus subject to detention or arrest.  It is simply up to each individual officer's subjective interpretation." (*Id.* 10:13–17.)  Defendants dispute any ambiguity and point to the definition of "practicable" in Merriam-Webster's online dictionary—"capable of being put into practice or of being done or accomplished; feasible." (*Defs' Opp'n* [Doc. 45] 9:9–21.)

In <u>Shuttlesworth v. City of Birmingham</u>, 382 U.S. 87 (1965), the Supreme Court evaluated a loitering ordinance prohibiting "any person or any number of persons to stand, loiter or walk upon any street or sidewalk . . .  as to obstruct free passage over, on or along said street or sidewalk."  <u>Id.</u> at 88.  The ordinance also made it a separate crime for "any person to stand or loiter upon any street or sidewalk of the city after having been requested by any police officer to move on."  <u>Id.</u>  The Court found the second part of the ordinance unconstitutional:

> Literally read, therefore, the second part of this ordinance says that a person may stand on a public sidewalk in Birmingham only at the whim of any police officer of that city.  The constitutional vice of so broad a provision needs no demonstration.  It does not provide for government by clearly defined laws, but rather for government by the moment-to-moment opinions of a policeman.  Instinct with its ever-present potential for arbitrarily suppressing First Amendment liberties, that kind of law bears the hallmark of a police state.

<u>Id.</u> at 90–91 (footnotes and internal citations omitted).

In <u>City of Chicago v. Morales</u>, 527 U.S. 57 (1999), the Supreme Court evaluated another loitering ordinance, which prohibited "criminal street gang members" from "loitering" with one another or with other persons in a public place. <u>Id.</u> at 45. The ordinance defined "loitering" as "remain[ing] in any one place with no apparent purpose." <u>Id.</u> at 53. However, one could only be arrested after disobeying a police officer's order to disperse. <u>Id.</u> at 47. Additionally, after the ordinance was adopted, the Chicago Police Department promulgated specific guidelines "to ensure that the . . . ordinance is not enforced in an arbitrary or discriminatory way." <u>Id.</u> at 48.

In evaluating the ordinance, the Court began by recognizing that "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment." <u>Id.</u> at 53. The Court then took issue with the "no apparent purpose" language in the definition of "loiter":

> It is difficult to imagine how any citizen of the city of Chicago standing in a public place with a group of people would know if he or she had an "apparent purpose." If she were talking to another person, would she have an apparent purpose? If she were frequently checking her watch and looking expectantly down the street, would she have an apparent purpose? Since the city cannot conceivably have meant to criminalize each instance a citizen stands in public with a gang member, the vagueness that dooms this ordinance is not the product of uncertainty about the normal meaning of "loitering," but rather about what loitering is covered by the ordinance and what is not. The Illinois Supreme Court emphasized the law's failure to distinguish between innocent conduct and conduct threatening harm. Its decision followed the precedent set by a number of state courts that have upheld ordinances that criminalize loitering combined with some other overt act or evidence of criminal intent. However, state courts have uniformly invalidated laws that do not join the term "loitering" with a second specific element of the crime.

<u>Id.</u> at 56–58 (footnotes with citations omitted). In responding to the City's contention that the ordinance provided adequate notice because loiterers could only be arrested after failing "to comply with an officer's order to disperse," the Court stated that "[i]f the

33

loitering is in fact harmless and innocent, the dispersal order itself is an unjustified impairment of liberty." Id. at 58.

Next, the Court found the ordinance also failed to establish minimal guidelines to govern law enforcement. Id. at 60. Despite the City's attempt to provide guidance to its officers, "[t]he 'no apparent purpose' standard . . . is inherently subjective because its application depends on whether some purpose is 'apparent' to the officer on the scene. Presumably an officer would have discretion to treat some purposes—perhaps a purpose to engage in idle conversation or simply to enjoy a cool breeze on a warm evening—as too frivolous to be apparent if he suspected a different ulterior motive." Id. at 62.

Similar to the "no apparent purpose" language in Morales, the "as near as practicable" language in SDMC § 82.0203 fails to notify pedestrians about what conduct is prohibited because it is unclear how "near" to a building line or curb line a pedestrian must stand. Does one need to be standing on the edge of the curb line or touching a building to comply with the ordinance? What about safety issues, particularly when standing on a curb line during traffic? Is there a time limit on how long someone may stand in the middle of a sidewalk before being cited? Did the City really intend to criminalize stopping in the middle of a sidewalk to tie a shoe, answer a phone or ask for directions? As stated in Morales, "the vagueness that dooms this ordinance is not the product of uncertainty about the normal meaning of 'loitering,' but rather about what loitering is covered by the ordinance and what is not." Id. at 57. Additionally, because the ordinance fails to combine loitering with some other overt act or evidence of criminal intent, it falls within the group of ordinances invalidated by state courts. Id. at 58.[16]

---

[16] See State v. Richard, 108 Nev. 626, 627, n. 2 (1992) (striking down statute that made it unlawful "for any person to loiter or prowl upon the property of another without lawful business with the owner or occupant thereof"); City of Wapakoneta v. Jeanneret, 1978 WL 215780, *1 (Ohio App. Ct. Feb. 28, 1978) (finding loitering ordinance unconstitutionally vague which made it a misdemeanor "for any one person alone or in concert with others to assemble or congregate on the public portions of a parking lot for the purpose of lingering or loitering in any manner"); State of New Jersey v. Caez, 81 N.J.Super. 315, 318–319 (1963) (finding unconstitutional a loitering ordinance providing, in relevant part, "[n]o

SDMC § 82.0203 also fails to provide sufficient guidance to law enforcement. Whether it is "practicable" or "feasible" to stand "near[er]" to a "building line or curb line" depends on each individual officer's subjective judgment. Additionally, unlike Morales, where officers were provided guidance for enforcing the ordinance, here, there is no suggestion the City has provided any guidance to officers. Thus, similar to the ordinance in Shuttlesworth, SDMC § 82.0203 essentially allows pedestrians to stand on a sidewalk at the whim of any officer and criminalizes standing in the middle of a sidewalk without any unlawful conduct.

In their opposition, Defendants contend the ordinance was intended to prevent "people from impeding the pedestrian flow of traffic" and cite Coates v. City of Cincinnati, 402 U.S. 611 (1971), for the proposition that a City may prevent people from blocking sidewalks. (Defs' Opp'n [Doc. 45] 8:27–9:2.) This argument only confirms the ordinance's vagueness.

In Coates, the ordinance prohibited "three or more persons to assemble * * * on any of the sidewalks * * * and there conduct themselves in a manner annoying to persons passing by * * *." Id. at 611–12. In acknowledging that a city is free to enact ordinances

---

person shall loiter, lounge or sleep in or upon any street, part or public place" because it is a "fundamental proposition that no ordinance may unreasonably or unnecessarily interfere with a person's freedom, whether it be to move about or to stand still."); Commonwealth v. Carpenter, 325 Mass. 519, 91 N.E.2d 666, 667 (1950) (loitering ordinance criminalizing the failure "to move on as soon as seven minutes have elapsed after" an officer's dispersal order was unconstitutionally vague because it failed to "prescribe any standard capable of intelligent human evaluation to enable one chargeable with its violation to discover those conditions which convert conduct which is prima facie lawful into that which is criminal"); but see Tacoma v. Luvene, 118 Wash.2d 826 (1992) (upholding ordinance criminalizing loitering with purpose to engage in drug-related activities); People v. Superior Court, 46 Cal.3d 381, 394–395 (1988) (upholding ordinance criminalizing loitering for the purpose of engaging in or soliciting lewd act); People v. Wedlow, 169 N.W.2d 145, 146–147 (Mich. App., 1969) (rejecting constitutional challenge to an ordinance prohibiting "loitering," which was defined as "standing or idling in or about any . . . sidewalk . . .so as to hinder or impede or tend to hinder or impede the passage of pedestrians" because "loitering" was sufficiently well defined "so as to limit application to those persons who are obstructing free passage of pedestrians. The ordinance does not prohibit standing on a sidewalk, but only standing so as to hinder or impeded pedestrian traffic.").

1    preventing "people from blocking sidewalks, obstructing traffic, littering streets,

2    committing assaults, or engaging in countless other forms of antisocial conduct," the

3    Court also explained that the ordinances must be "directed with reasonable specificity

4    toward the conduct to be prohibited." Id. at 614 (citation omitted).

5         Coates does not assist Defendants because section 82.0203 does not criminalize

6    impeding the pedestrian flow of traffic; it criminalizes standing on a sidewalk.  As

7    Defendants acknowledge in their opposition, the City amended the ordinance in 1928 and

8    eliminated the language requiring an obstruction.  (*Defs' Opp'n* [Doc. 45] 8:26–9:2.)  The

9    previous version provided that it was unlawful for any "person to stop, stand or loiter on

10   the sidewalk so as to impede pedestrian traffic, or to do or perform any act the result of

11   which shall create a congestion of pedestrian traffic on the sidewalk." (*Defs' Ex. 25*

12   [Doc. 42-15] MSJ Ex. 25-0217.)  The current version no longer includes the "impede

13   pedestrian traffic" or "create a congestion" language and instead makes it unlawful to

14   simply "stand on a sidewalk, except as near as practicable to the building or curb line."

15   And Defendants have cited no state court decisions limiting the ordinance's scope to

16   impeding the flow of traffic.  Thus, to the extent the ordinance was intended to prevent

17   people from blocking sidewalks, under Coates the ordinance is not directed with

18   reasonable specificity toward the prohibited conduct.

19        Finally, the ordinance's failure to provide guidance to law enforcement and the

20   arbitrariness with which it may be enforced is demonstrated by Lee's arrest.  Video

21   appears to show other men and women standing near the middle of the sidewalk before

22   Lee was detained.  (*Lawyer BC Video* 0:00:20–0:01:10.)  There is no indication they were

23   cited for violating section 82.0203 or ordered to leave the area.  Additionally, when

24   Officer Lawyer grabbed Lee, he appeared to be standing within 3 feet of the curb line,

25   with Officer Larson standing between him and the curb.  (*Id.* 0:01:20–0:01:24.)  Lee,

26   therefore, was arguably "as close as practicable" to the curb line when Officer Lawyer

27   decided to detain him.  Under these circumstances, Lee's arrest demonstrates that the

28

City's failure to provide guidance to its officers leads to arbitrary enforcement of the ordinance.

For these reasons, the Court finds SDMC § 82.0203 unconstitutionally vague.

### C.   **Lee is entitled to a declaratory judgment that SDMC § 82.0203 is unconstitutionally vague.**

Lee also moves for summary judgment on his declaratory judgment cause of action, which asserts SDMC § 82.0203 is unconstitutionally vague.  The same issues raised regarding the Monell claim are raised here.  Accordingly, the Court finds Lee is entitled to a declaration that SDMC § 82.0203 is unconstitutionally vague.

## VI.   CONCLUSION & ORDER

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' summary-judgment motion [Doc. 42] and **GRANTS** Plaintiff's motion for partial summary judgment [Doc. 43].

**IT IS SO ORDERED.**

Dated:  October 2, 2020

Hon. Thomas J. Whelan
United States District Judge